Case number 231652, Michelle Turangeau v. Nappi Distributors At this time, would counsel for the appellant please introduce herself on the record to begin. May it please the Court, Danielle Quinlan for the appellant, Michelle Turangeau We are here today with many issues, but the three issues that we've identified as being the most important involve whether the affirmative defense instruction for the defendant was proper and appropriate. It's our position that the affirmative defense provided to the jury that the business decision was made based on lowering margins and needing to reduce payroll. That issue or that fact, while it may be true or not, does not explain who was chosen to receive 3% and who was chosen to receive 2% commission. And this is a really significant issue because throughout the trial, throughout discovery, the only explanation provided by, I am sorry, I wanted to reserve three minutes at the end. The only explanation provided by the defendant, Nappi Distributors, to explain why Michelle was not eligible to receive the 3% commission was that it was based on grandfathering, and grandfathering was determined by seniority. In order for seniority to be an affirmative defense, there has to be a benchmark. I just want to make sure I didn't misunderstand. You seem to preface this discussion by referring to a jury instruction as if you're challenging a jury instruction. Yes. So I'm just looking at the heading of the arguments. You have jury's verdict was contrary to the law and against the great weight of the evidence. That's one. That's the seniority point, not relating to a jury instruction. Then you have a separate argument about failing to give a jury instruction. That doesn't seem to be what you're talking about. So I'm a little confused what's going on. Sure. So the first issue involves the affirmative defense jury instruction. And if we look at what was actually read to the jury... Are you challenging the giving of the instruction, or are you challenging the weight of the evidence in light of what was actually read to the jury? Or are you challenging what the legal standard that applies is? Both. Did you object to the jury instruction? We did object to the jury instruction. Is there some point in your brief where you talk about the jury instruction and do the analysis of when a jury instruction is wrong? I believe in our reply. Okay, but usually you've got to do it in your opening brief or it's waived. The issue is that they were allowed to provide an affirmative defense, but the affirmative defense did not explain... But that's not... There's two different possibilities. When you're objecting to a jury instruction that was given, that can be error. That's not presented in your opening brief at all. If you're saying it's raised in your reply brief, you can't usually do that. I believe it's also touched upon in our opening brief. It's just explained in more detail in our reply brief. Where in the opening brief? In the opening brief, it is... You're just doing exactly what it says, which is not challenging that there can be an affirmative defense of some kind. You're just saying here in light of what seniority is and grandfathering, this was an impermissible ground for ruling as it did, which is a perfectly viable challenge. I'm not saying you can't bring that challenge. It doesn't have much to do with the jury instruction. I believe we raised the issue. I'm starting on page 26. Matthews asserted that the differences in pay between miscarriage and male workers are due to the quantity and quality of production and or to a business decision such as adjusting its payroll to reflect industry standards, not based on gender. And that's where we get into the further explanation that this defense only explains why they created differentials that there might be a 2% and a 3%, but it doesn't explain how NAPI came to the conclusion of who is 2% and who is 3%. And that explanation can only... The only explanation provided for that was grandfathering, which is seniority. Okay, so I understand that argument. That's just not a jury instruction challenge. It doesn't mean you can't bring the challenge. It's just not related to an error in giving a jury instruction. But I think it is an error in giving the jury instruction. Let's put aside the jury instruction and let's just talk about the defense. Is this a seniority argument or not? Yes. And how come grandfathering is the same as seniority? I think Sanders is a case... There were multiple cases that we cited to where grandfathering is ubiquitous to seniority. The defense itself, NAPI distributors admitted that the defense of grandfathering was based on seniority and tenure, but that there was no benchmark where they could attain the 3%, no number of years where those sales representatives could attain the 3% status. And what's confusing about it all is that when Ms. Taranto was hired, she was hired at 2% plus 1% commission. Had this occurred in 2014 and she was just hired at 2%, there would be no question, I think, about whether or not there was an Equal Pay Act violation based on that issue. The fact that it was sort of prolonged until 2019 when they made the decision to remove her salary, but not move her up to the 3% commission is what made it a little bit confusing. Let me just understand. In a seniority system, there doesn't need to be any change in the world that causes them to adopt a seniority system, right? They just start from day one saying, in our estimation, the best way for our business to run is that the longer you're here, the better you'll do. And so we're going to do our pay based on that. My understanding is what your opponent is saying is that's not what we wanted to do. What we wanted to do was not have a seniority system, but we had a change in business circumstances, and then we had to figure out how to respond to it. And we could respond to it in different ways. We could respond to it with a lottery. Certain positions are going to get more based on what you do. Instead, what they decided is anybody who was here before that happened gets the old pay because they're used to it, and anybody afterwards gets the new pay, and it's going to be lower because we can't afford to pay the same. That doesn't sound like a seniority system. That sounds like an approach to responding to a business circumstance, which, if it's based on sex, is impermissible, but you'd have to show it's based on sex. I don't see why it's evident that you can show it fails because it's not a seniority system, since they're not saying it's a seniority system. What's your answer to that? Well, my answer to that is that the court has held that you can't have these affirmative defenses that are essentially the same. So maybe it's not a seniority system, but it's based on seniority, since a seniority system is an affirmative defense under the Act. But I guess what I'm saying is the distinguishing characteristic, and you tell me if there's some case saying this can't be a distinguishing characteristic, is that unlike a seniority system in which from the get-go they're trying to reward people who are there longer, this is a response to a business circumstance that requires them to change their pay scale because of the economic circumstances. And then the choice is people who are used to that pay get it. So there's no benefit over time, they're not going to get more for being there longer, it's just you get what you already were getting, new people don't. Is there some case that says that, too, is a seniority system? Sort of drawing the line in the sand. Based on a new eventuality. I believe that if we look at Sanders, I don't know that it was directly on point, that the grandfathering system is synonymous with a seniority system, but there is case law that says if you have these affirmative defenses, we created this statute to get rid of this perpetuating issue of paying women less. So for an employer to come up with a reason such as grandfathering based on seniority, since there's already a bona fide seniority defense. I could see that if there was no change in business circumstance necessitating them allocating pay differently, just all of a sudden labeling it grandfathering, they wake up one day and they say, we don't have a seniority system, but we've decided anybody who is here longer gets more. It seems like you would have a really strong case. But their contention is that's not what happened, there was a change in business circumstance that led them to think we can no longer pay everybody at the old rate, so we have to decide who gets what. And then they chose in response to that to keep the people who are already getting it, have it, new people get less. And the question is, is that the same? And I'm not quite hearing an answer why that is the same. It is the same, and I think if you look at ADOMES, I don't know if I'm pronouncing that correctly, these post-event justifications cannot be used. There's a higher standard for these affirmative defenses, especially ones that are based on sort of these vague excuses such as market forces or change in circumstances and inflated payroll. There was no documentation to support any of what they asserted were the reasons. It was just a statement, one of which was never even previously disclosed prior to the trial itself. But there was no documentation showing that in 2014 or 2015, payroll was getting too high, profits were going down, that margins were decreasing. No, what happens when margins decrease, you pass that on to the customer. You don't take away from the payroll and decrease pay for your employees. But the idea, I disagree with the assertion that they wanted those who had the 3% to continue and those who didn't, wouldn't, and sort of draw the line in the sand there. Because Mike Hale, the manager, said she was a 3%er, she was the same as the rest of them. But isn't that because she got 2% plus the 1% for compensating her for the bad roots? 1% salary instead of 3%, 2% question. I don't know if the record supports this, only because they said her roots were so bad that she needed the extra 1%, but she was a 2%er with respect to the pay scale otherwise. Yes, because she had a seasonal route that was really just busy in the summertime, winters were slow, so they wanted to make sure that she didn't starve. And then when they took away the 1%, the contention was her roots changed, so she didn't have that disability anymore. No, no, she had the same root the entire time she was married. There was no change in her root when they took away the 1%? She got a new account on her root, but it was still the same seasonal root. What does that mean, a new account? A new store that she would be selling. I see, but they said made the root stronger, more likely to be lucrative. Right, and the issues with the roots itself, this was a root that she held, she had 87 accounts, it was previously held by Ian Brown, the wine manager. At the time he got the route, it was 125 accounts on that route. Prior to him was Paul Carr who held that route, he was the wine director that hired Ms. Tarango, he had 150 accounts in that route. So it wasn't just an issue of does she have the same percentage, it was also what is the root and what is on her root. Counsel, can I just ask you this one question? If Daniel Tulin had been hired after the change in policy, but before your client, would you have a stronger case, a weaker case, or the same case? If he had been hired after our client, but... Before your client. Before our client, but paid at 2%? Yeah. I think it would be weaker, but I also think the conversation that he had with the owner, Frank Naffi Jr., telling him that not that you are never entitled to 3% or you will never get 3%, but you need to show me that you can prove your worth and earn it. So there was no conversation even at that time. Sounds like it would be the same. Yeah, I think it would be the same. I take that back. Because it's still a seniority system. So you really have two arguments you're running. One is it's a seniority system, so you win because of that, or the verdict has to be thrown out because on this record you couldn't possibly find it's not a seniority system. And then second, I guess I'm trying to understand, what is the significance then of the hiring after your client of the second person? Is there any import to that? I don't see the import, because at the time she was the first woman hired. And the first one hired and only paid 2%. This change came with the hiring of a female. Well, let me help you out. If Tulin had been hired before her, that would give the defendants an argument that, no, this was a business decision, right? We didn't do it when it was in place before we hired any women. Wouldn't that be the argument? So it doesn't affect the strength of your case. I think even stronger in our argument is the fact that an applicant for the same position, the same route, right before Michelle applied for the position and was offered it, was offered the route and turned it down at 3% and it was a male. So I just think that was Justin Park. And that evidence came in. What's the temporal connection when you say he turned it down just before? Months before Michelle was offered the position. Do you know how many months roughly? I would say three to four months. And they're contending that the change was after he turned it down, though, correct? No, that he did it, that he was offered that but was not authorized to do so. Paul Carr was not authorized to offer him at 3% even when he did it. So in other words, they give a date for when they made the change. Post that date, they're offering more than that to a male who turns it down. Then the first woman who comes along after that is given 2%. All of which you say undermines the argument. But I guess, and just last on standard of review because we have a jury verdict. Yes. Yes, it's difficult. But I think the corning instruction could have helped us overcome this jury verdict as well as the issues that we have with juror 161 and the bias that he had. I don't know how long you want me to go. No, that's fine. Yeah, I got it. You reserve three minutes, though. Thank you. Yes, may it please the Court. John Wall on behalf of Appellee and Happy Distributors. I had a few remarks prepared, but in light of the colloquy that just occurred, I just want to address this directly and very quickly. The evidence at trial was that Paul Carr offered an individual basically a package, which there was some testimony that amounted to a 3% commission. When the owner, who had already made the decision to go to a 2% commission, found out that he had attempted to do this, that individual, Paul Carr, said that the owner was extremely upset with him and said, you're not to be doing that, it's 2%. But when was that? That was made in 2014 before Ms. Tarangio ever applied for the job. So he made this clear before Tarangio applied and before any offer was extended to Tarangio that it was 2%. That was what was supposed to be done. What's the evidence that it was a business decision to go from 3% to 2%? Well, I think the district court, in reviewing in its order on the motion for new trial, I think laid out exactly what was presented for testimony. The business decision was tied primarily to the feasibility, viability, moving forward of paying the wine sales representatives the level they were being paid. It was talked about by various individuals, Christine Fox, Frank Knappi, even Mr. Hale mentioned it, that it was not tenable going forward based upon both the local conditions, but also nationally what was going on. And so therefore they made a decision to try and curb those expenses by going to a 2% commission for people hired on by attrition as people with 3% left or retired, to replace them with 2% persons making 2% commission. And in fact, so that evidence is all in the record, we laid it obviously in our brief. In terms of the issue raised by Ms. Quinlan about who was supposed to get 3% and 2%, I think Your Honor has already indicated that they made a decision on how to deal with this business issue that they were faced with, and given the fact that these individuals had developed routes, had developed relationships with these accounts which were extremely important for the wine sales industry, they made a decision that they wanted to retain these individuals, they didn't want them leaving by changing their compensation package, so therefore they made a decision to draw the line in the sand and do it by attrition. Just so I get your position, the idea would be it's just not a seniority system, as long as you can show that there was a business reason for it. Grandfathering in the abstract could be a seniority system if you just say, oh, we're not doing a seniority system, we're just grandfathering. You don't seem to take issue with that. We don't generally because, and obviously the judge worked through these defenses in crafting the jury instruction. So if you were right on that, that the business, but even then there would be, I guess, two different ways of attacking something that's trying to be justified on this ground as not a seniority system. One is, well, they could show you didn't really have a business reason, so it's kind of a pretext, it really was just a seniority system in disguise. The second would be even if it wasn't, you nonetheless adopted it for the purpose of discriminating on the basis of sex. That would be the two ways of attacking it. And is the second one even in this case, or is it really just the first one that we're dealing with? I think it really is just the first one. And ultimately what the jury heard was the explanations provided by a number of witnesses as to the rationale and the business conditions that prompted the decision, and they based their decision by evaluating that evidence. And the trial court, obviously, in ruling on the motion for a new trial, acknowledged... Was there summary judgment motions in this case at any point? There were. And everything was denied, I take it? It was denied for almost all the claims, yes. I think there was one claim that was removed on summary judgment. And summary judgment, were the cross motions for summary judgment? They were not. Well, we lost the motion. The judge denied our request for summary judgment on the Equal Pay Act claim and a variety of other claims. I'm sorry, counsel, can I just get a couple of fundamental questions about the seniority system affirmative defense out of the way? So that is an affirmative defense, right? That is a bona fide seniority system. And what I specifically want to know is if it is a bona fide seniority system, does it have to include later hires? I think what the judge determined in ruling on whether or not to instruct on the bona fide seniority system, is that it be something that was established typically in writing that describes basically the progression of benefits based upon or additional pay based upon the length of time that you're there. My recollection is that it was not based upon, for example, changes in business conditions, which might prompt adjustment in the way the business is handled. So my recollection from the judge's ruling on this was that it's keyed towards just duration at the company based upon an initial determination that this is the thing we value, just being here, as opposed to any separation of practice. Yeah, so part of where I'm confused is how the case was pitched to the jury. Was it pitched as, you know, one side is saying, oh, their affirmative defense is that it's a seniority system, but that's a pretext, or the defense is not under seniority, it's under the third category. I'm going to call it the business decision category, and the seniority system part of it is really a red herring from the point of view of the defendants. I mean, what actually happened? What did the jury get? I confess that I don't recall studying the closing argument of the plaintiff's attorney to determine whether or not seniority was specifically mentioned. But I do recall that in dealing with the affirmative defense, basically the plaintiff said, they've made an argument that this was a business decision, or it was based upon quality and quantity, because that was a separate issue that was dealt with at one point that ended up not being, I think, as significant, particularly for the purposes of the appeal. But they just mentioned, they've said that there's a business reason. You'll have to evaluate whether or not they've established that, in fact, there's a business reason that justifies this change. In opposing the, in moving for summary judgment, did you move for summary judgment on the ground that it was in the third category, or on the ground that it satisfied the seniority standard? I honestly don't remember, Your Honor, exactly the focus of that. I think part of it was simply a matter of trying to suggest that there was not evidence of a prima facie violation, I don't recall how deeply we got into the affirmative defenses on that. I just don't recall. In the motion for, to overturn the verdict, was the argument made to the judge for overturning the verdict that, to just follow on Judge Howard's question, because it potentially could be relevant, one version of the motion could be, well, insofar as the jury thought it was a seniority system, it clearly isn't, that can't be a defense, and there was a basis for them thinking that because it was pitched that way. The other version would be, they're trying to tell you it fits into the third category, it doesn't, because there was no evidence to support it being in the third category, it only fits into the second category, the seniority, was it the latter or the former? My recollection is the latter, and that's specifically because I think the judge had indicated, I took seniority out of this instruction, and I don't believe that what we were hearing from the defense was... When you say I took it out of the instruction? In other words, he did not instruct, in instructing on the affirmative defense under the Equal Pay Act, he did not take any criticism from the instruction, the instruction simply dealt with a defense based on either quality or quantity of production, or a business reason that was unrelated to sex. And the reference to the jury instruction that's in the reply brief, there was a reference to the jury instruction being problematic, do you know what that's about? I don't, I think in our view the reply brief introduces an argument that was not previously really pitched to the jury, or coalesced in this case, from our perspective this was always a 2%, 3% violation argument that they made to the jury, which is evident from the way they asked the jury to calculate damages based upon a comparison of what she made at 2% versus what she would have made at 3%. It didn't have any tie, specific tie to the date on which the NAPI started to reduce her salary. So the issue in terms of the jury instruction that you're talking about, that was raised in the reply brief, I don't believe it's really been preserved for appeal in this case. Thank you. Beyond that, Your Honor, we were planning on relying upon our brief for the remaining points raised in the brief. We think that the court's analysis of each of those issues, including the Corning instruction, which we believe was not either accurate as a matter of law, or was generated by the evidence, so the judge properly refused to instruct on Corning, and that the issue with regard to the juror, that they had not presented a colorable argument, or case basically, that either the juror had given false information in the voir dire, or that there was any basis to believe that he would not have been fair and impartial based upon the information they submitted. So we'll rely on our briefs for the principal portion of those arguments, unless the court has any other questions. Yes. So the 1% salary that she received for a period of time, the fact that it's 1% seems to tie pretty closely to a 3% commission. What was the evidence that it was tied to something else? I know there's an explanation that it was because of her route and the seasonal nature of the route, whatever it was. Well, what was it? I mean, it looks like it's a 1% salary to maybe soften the blow about the change in the company, which changes the case dramatically. Well, there are three things I'd like to say to that, Your Honor. First, the whole concept of this being a 1% may be something that subjectively some people involved thought in their minds. But the reality is, of course, when you're dealing with a commission situation, it's not really 1%. It's a fixed amount, and the commissions go up or down based upon the amount of sales. So that's really a post-har kind of justification that I think subjectively some people testified to. What were the terms of the promise with respect to what's being called the 1%? I believe what it was is it was going to be 2%, and effectively what the offer was is, I want to get you close to $60,000. And part of that was based upon some of the historic numbers from terms of sales, and they said, and we'll supplement that with some salary. And somebody made a computation as to what it would take to get to about $60,000. The argument and the thought process from some of the people involved was, that's about what 1% would be. And we don't dispute that there was testimony in that regard. So why were they trying to get to $60,000? I think it was a business decision that that would make it a viable business opportunity for the person applying. No, but what was the evidence? The evidence on that point was simply that the manager who made the offer, Paul Carr, said, I'm going to try and put together a package that gets you close to $60,000. And there's also evidence saying that the calculation was made that comes to about 1%? The evidence was, I believe, was that the calculation was left to somebody who worked for the, basically accounting for NAPI to try and get to a figure close to that $60,000. And the number that came out was something approximating 1% based upon. I see. So the way you're telling it, they picked a number independent of knowing whether that would be 1% or not. Correct. Then it turned out that that number correlated with 1%. But there's no evidence indicating that he chose $60,000 because it would be 1%. Right. I think the number he chose was one that he thought would be fair based upon historically what people had made. And is there evidence saying that? I don't quite understand that math. I'm sorry. So if they estimated what she would get on a 3% commission, they must have come up with $60,000. Well, the $60,000 number was based upon not just commission and what they were going to put for a base salary. It was also based upon incentives. Let me ask it slightly differently then. If she were getting a 2% commission, they must have estimated that she would get $40,000. With all these other things that you're now introducing. There's another variable in here, but I guess that would be the way that somebody who's putting together those numbers would be looking at it, yes. But my point is then the $60,000 figure looks suspicious. So why isn't it suspicious? I don't understand what you mean. It's 3%. Well, what the evidence was, Your Honor, was that what the person was trying to do was making the offer was make sure that the seasonal route, she'd be able, she was a new salesperson, stepping into a route that she'd be able to basically get through the winter months until you get the sales period, which is generally the summer. And so they wanted to make sure that there was some cushion for her. And also as a way to sort of work around this edict that he'd received, that you can only hire them at 2% commission. And that's the way they moved forward, even though the evidence was they're not typically salaries, they're not typically used for these southern routes. Is there any evidence in the record as to when they took away the 1%, whether she was staying roughly at $60,000? Well, first of all, they didn't take away the 1%. They simply reduced it by a certain amount. And there's evidence that her income continued to increase, at least stay stable, even during that period. Yes, correct. But the point was that it was really, it was not something that was intended to be permanent, because it's not something that was necessary for these routes in southern Maine. None of the other salespeople, with the exception of Mr. Toulon, had a salary on top of the percentage. And none of the 3% individuals, salespeople, had salaries. So it was not designed to be something that should have been necessary. And that's when they were doing the reorganization, developing the routes, that they were able to say it's a good time to curb back on that salary, which shouldn't be needed in the first place. And what does the record show about people, male hires after her, if anything, who got 2%? The evidence is that everybody who was hired, male or female, from 2014 forward, were hired at 2% when they were hired for commission purposes. And how many people is that, roughly? I would have to say, I would be guessing. It's some number like 5, 6, 7, 8, something in that ballpark. In the gender breakdown of that group? I believe there was either one or two other women in that group, and the rest were men. We would ask the Court to affirm the judgment below. Thank you. Thank you, Counsel. At this time, Counsel for the Appellant, please reintroduce yourself on the record. You have a three-minute rebuttal. I just wanted to address briefly how that $60,000 salary was calculated. There was a discussion between Paul Carr and Michelle Tarango as to how much money Ian Brown earned with a 3% commission when he previously held the position, and that was roughly $60,000. He told her, you can earn more with the incentives if you get good at them. But that's how that number came to be. Why does that help you particularly? In other words, if there's evidence in the record, and obviously we have to go through and see, and you say maybe there isn't, but let's assume for this question maybe there is, there's a business decision where they say it's not sustainable to have the new people coming in getting 3%. There's nothing necessarily inconsistent with that and hiring somebody at 2%, but finding ways to get them to a salary that's equivalent to the last hire, because what they are protecting themselves against is the cost of having to pay this new person what they'd be earning at 3%. That's the thing they're trying to avoid, right? I mean, what they ended up calculating ended up being more advantageous to Michelle based on the percentages. Because if she had just gotten 3% commission, she actually would have earned less than what the 1% salary. But over time, would that be true? It wasn't true until 2019 when they gave her the new accounts. That's when you start to see... Yeah, but that would be consistent with the business idea, which is we'd like to have people have good accounts selling lots, but if they're doing that at 3%, that's going to cost us more than we want to pay. So I don't see exactly why the fact that it's 3%, even if it came out to roughly 3% at the time one with her, that helps your case particularly. Well, I think it's because of the way that it was presented to her. Instead of paying you 3% because she knew that all of the other sales representatives there were hired at 3%. Well, that I can see helps you. If showing that she was really paid 2%, that helps you. Only if there's no business justification. But showing she was really paid 3%, I don't see how that helps you. Well, going to the business justification, turning... Well, just provided that every single hire after Michelle received 2%, but that's just not the case. Dwayne Preble was hired as a sales representative in 2016 and provided with a commission of 2.5%. So it's just not true that everybody received 2%. There wasn't a hard and fast line of everybody's getting 2%. Another interesting issue is they wanted to reduce these inflated salaries. The inflated salaries came from the grandfathers who had these very large roots. 150 accounts, 170 accounts, earning 150 to 170,000 a year. They did not need to reduce the rate of the commission if the goal was really to lower the amount of money they were getting. It was to divide up those accounts and they weren't willing to do that because they didn't want to lose these really good salesmen. They were willing to risk losing Michelle Tarango. Why? Because she's a woman and we have a bunch of direct evidence of thinking historically with the NAPI distributors that they did not want to hire women for the sales representative position. Jim Burke, the director of human resources.